UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| vs. | ) ) | CAUSE NO. 1:12-cr-120-WTL-DML |
| DANIEL MCLAYEA, | ) ) ) | |
| Defendant. | ) | |

## ENTRY ON MOTION TO SUPPRESS AND MOTION FOR A *FRANKS* HEARING

This cause is before the Court on Defendant Daniel McLayea's motion to suppress (dkt. no. 35) and motion for a *Franks* hearing (dkt. no. 41). For the reasons explained herein, McLayea's motions are **DENIED**.

## I. BACKGROUND

Beginning in April 2010, Detective Scott Wolfe of the Indianapolis Metropolitan Drug Task Force ("Metro Drug") began investigating McLayea after receiving information from a confidential informant that a person known as "Bean" was selling a large amount of marijuana. The informant also told Detective Wolfe that Bean drove a blue Dodge van. Detective Wolfe was later able to identify "Bean" as McLayea.

McLayea was arrested for operating a vehicle while intoxicated in September 2010, and spent all of September and October 2010 in jail. While there, Detective Wolfe and DEA Special Agent Dan Schmidt monitored numerous phone calls McLayea made. Detective Wolfe and Special Agent Schmidt recognized some of those phone calls as coded conversations regarding future drug transactions. McLayea mentioned several storage units that he used, as well as the addresses for where they were located. Special Agent Schmidt thus obtained subpoenas to

review the records at two storage units in Indianapolis, Indiana: U-Stor-It, located at 9685 Fall Creek Road ("the Fall Creek facility"), and The Store House, located at 2425 North Mitthoeffer Road ("the Mitthoeffer Road facility").

McLayea was released from jail in November 2010, and began a work release program through Marion County Community Corrections. Beginning on January 11, 2011, Detective Wolfe had a Global Positioning System ("GPS") device placed, without a warrant, on McLayea's blue Dodge van. This device was removed on January 23, 2011, and a new GPS device was placed on the same van on January 24, 2011. During these two weeks, Detective Wolfe monitored and tracked the van's movements. On January 25, 2011, Detective Wolfe was able to obtain the location of McLayea's van via the GPS device and began physical surveillance. He identified McLayea as the driver of the van while at a gas station and then followed the van to an apartment complex where he observed what he believed to be a narcotics transaction. Since he knew McLayea had a suspended driver's license, he requested a traffic stop.

Sargent Paul McDonald conducted a traffic stop of McLayea, at the request of Detective Wolfe. When he approached the van, he recognized the smell of marijuana. Sgt. McDonald, therefore, requested assistance from a narcotics K-9 unit. The unit conducted an open air sniff of the van and alerted. The van was subsequently searched, revealing 3.9 kilograms of a substance containing marijuana. McLayea was arrested, read his *Miranda* warnings, and transported to an interview location. Detective Wolfe interviewed him and obtained some personal information, including his home address of 10310 Kensil Street, Lawrence, Indiana; however, McLayea unequivocally said he did not wish to make a statement. In a search incident to his arrest, Detective Wolfe found business cards for the two storage unit facilities noted above, as well as a

business card for a U-Stor facility located at 4055 East 56th Street in Indianapolis, Indiana ("the 56th Street facility").  He also found a receipt from that facility for Unit G3 belonging to Almedia[1] Phipps, a name Detective Wolfe had heard McLayea use in his jail cell phone conversations.

That same day, around 10:00 p.m., Metro Drug Detectives Randy Dings and Travis Cline went to McLayea's residence.  McLayea's girlfriend, Brittany Nevers, answered the door.  The detectives asked if they could enter the residence, and Nevers allowed the detectives to enter.  While in the residence, the detectives observed what they believed to be a "blunt" or "marijuana cigarette" on the kitchen table.  Detective Cline conducted a field test on the blunt, and it indicated a positive result for the presence of marijuana; however later testing of this blunt by a crime lab produced a negative result.

Detective Cline then requested permission to search the residence.  Nevers told the detectives that if they did not have a search warrant, they should leave.  The Detectives thus obtained a search warrant around 1:20 a.m., on January 26, 2011, and they searched the residence.  Inside, they found $2,000 and a pistol.  They also found storage units receipts for the Mitthoeffer Road facility issued to Almedia Phipps, Unit 4018, and to McLayea, Unit 5019.  Business cards for the Fall Creek and 56th Street facilities were also found.

On January 26, 2011, therefore, Detective Wolfe applied for a search warrant for the 56th Street facility to search Unit G3.  The warrant was obtained and executed around 4:30 p.m., revealing a rifle, two handguns, scopes, ammunition, gun pamphlets, and $28,970.

---

[1] The Court notes that both the Government and the Defendant use the name Alme*d*ia Phipps in their briefs; however, Detective Wolfe uses the name Alme*l*ia Phipps in his affidavit. The Court has chosen to use the spelling of the name as it has been represented by both parties.

On July 24, 2012, a grand jury indicted McLayea for knowingly possessing a firearm in violation of 18 U.S.C. § 922(g)(1), and knowingly possessing with the intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1).

## II. **DISCUSSION**

McLayea seeks to suppress the evidence obtained from the search of his van, the search of his person, the search of his residence, and the search of Unit G3. The Court will address the searches, in turn, below.

### A. The Search of McLayea's Van and Person

McLayea correctly argues that the warrantless installation of the GPS device violated his Fourth Amendment rights pursuant to *United States v. Jones*, 132 S. Ct. 945 (2012). In *Jones*, the Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" under the Fourth Amendment. *Jones*, 132 S. Ct. at 949. As a result, McLayea argues that the exclusionary rule should bar the introduction of evidence obtained as a result of this violation.

As noted above, after the GPS device was installed, McLayea was stopped by officers while driving his van because he was driving while his license was suspended. The Government thus argues that because this traffic stop was legal, the evidence that was found after a search of his van—3.9 kilograms of marijuana—need not be suppressed.[2] While the Court agrees with the

---

[2] The Government also contents that suppression is not warranted because the officers in this case were acting in good faith reliance on then-binding Seventh Circuit precedent that permitted GPS devices to be attached without a warrant. *See Davis v. United States*, 131 S. Ct. 2419, 2424-25 (2011) (holding "that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."). The Court need not decide if the good-faith exception applies, as it finds the Government's other argument in regard to the traffic stop and subsequent search of McLayea's van to be dispositive of the issue.

Government that the traffic stop was proper,[3] the legality of the traffic stop does not end the analysis. The crux of McLayea's argument is that the traffic stop was not sufficiently attenuated, or independent, from the illegal use of the GPS; thus, the evidence obtained from the traffic stop must be suppressed.

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Budd*, 549 F.3d 1140, 1144 (7th Cir. 2008) (citing *Segura v. United States*, 468 U.S. 796, 804 (1984). The rule, however, is not absolute. "The true question is 'whether, granting the establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id*. (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Ultimately, the Court agrees with the Government that "the evidence discovered in the search of the van was not the direct result of the use of a tracking device in violation of *Jones*," Gov. Response at 9, and therefore, does not believe suppression is warranted.

---

[3] McLayea does argue that the officers lacked reasonable suspicion to conduct a traffic stop. Def. Brief at 10-11. His arguments are essentially that Sgt. McDonald did not know if he was the person driving the van, thus preventing him from having reasonable suspicion that he was driving on a suspended license. The Court finds these arguments to be unavailing.

"A reasonable suspicion requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (quoting *Jewett v. Anders*, 521 F.3d 818, 823-25 (7th Cir. 2009)). It is undisputed that Detective Wolfe identified McLayea, not Nevers, as the driver of the van earlier in the day— whether that be in the afternoon hours (*see* dkt. no. 44-2 at 2) or at 6:15 p.m. (*see* dkt. no. 44-4 at ¶ 5). Detective Wolfe followed McLayea to an apartment, still recognizing him as the driver, and saw McLayea exit the apartment complex. He then contacted Sgt. McDonald to conduct a traffic stop. The Court believes, therefore, that Sgt. McDonald had a reasonable suspicion that McLayea was the driver of the van, as Detective Wolfe maintained physical surveillance of McLayea up and until he contacted Sgt. McDonald to conduct the traffic stop.

In *United States v. Martin*, 712 F.3d 1080 (7th Cir. 2013), the Seventh Circuit declined to suppress evidence resulting from an illegal use of a GPS device:

> The evidence he [Martin] seeks to suppress had little to do with the fact that a GPS device had been used at all: put differently, it was significantly "attenuated" from the improper installation of the device . . . The GPS data here appears simply to have aided law enforcement officials in tracking down Martin when they decided to effect his arrest. This is quite different from the situation in *Jones*, where the GPS data was used to establish a necessary link between the defendant and a cocaine stash house[.]

*Martin*, 712 F.3d at 1082. The Court finds *Martin* to be instructive in this case. The only connection between the use of the GPS device and the later traffic stop and search of McLayea's van is that Detective Wolfe used the GPS to locate McLayea on January 25, 2011. Once he did, physical surveillance was initiated. In other words, like was the case in *Martin*, the "necessary link" in this case is missing.

A case from another district court is helpful to further elaborate this point. The facts of McLayea's case are very similar to those of *United States v. Lee*, 862 F. Supp. 2d 560 (E.D. KY 2012). In *Lee*, officers received a tip that Lee would purchase marijuana in Chicago, Illinois and transport it back to Kentucky in his vehicle. *Lee*, 862 F. Supp. 2d at 562. Officers thus decided to attach a GPS device to his car—albeit, without a warrant—in order to track his movements. *Id*. A few days after the installation, the GPS device revealed to officers that Lee had driven north to Chicago and was currently traveling southbound towards Kentucky. *Id*. Kentucky State Police were notified, and Lee was eventually stopped for driving without wearing a seat belt. *Id*. at 562-63. Subsequently, narcotics dogs alerted to Lee's car, and when it was searched, officers found approximately 150 pounds of marijuana. *Id*. at 563.

The United States District Court for the Eastern District of Kentucky granted Lee's motion to suppress the evidence. In so doing, it found that the traffic stop was not independent—or attenuated—from the illegal use of the GPS device:

> Without the GPS tracking data, the DEA agents would not have known that Lee traveled to Chicago (his source for drugs), that he was returning to Kentucky along I-75, or his exact position . . . Without the information gained by the illegal GPS tracking, [the officer] would not have known where to find Lee, when to find him there, or that he should 'develop' probable cause to stop him.

*Id*. at 565-66. As a result, the evidence was suppressed.

While the facts of McLayea are very similar to *Lee*—a tip was given, a GPS device was attached, a traffic stop was conducted, and a subsequent search revealed marijuana—there was a "necessary link" present in *Lee* that is not so in McLayea's case. The court in *Lee* noted that the GPS data—the data that showed where Lee had traveled—had a specific connection to the evidence that was later found in his vehicle. The data, obtained by means of the illegal search, illustrated to officers that Lee traveled north to obtain drugs, and that is exactly what officers found when they conducted a search of his vehicle. The fact that Lee had traveled to Chicago at all, a fact officers only knew from the data revealed by the GPS device, was the entire reason they initiated the traffic stop.

McLayea's case is different. There is no connection between what the GPS data revealed for the two weeks the devices were attached to his van and McLayea's eventual traffic stop *other than* that the second GPS device gave Detective Wolfe McLayea's location. *See Martin*, 712 F.3d at 1082 ("The GPS data here appears simply to have aided law enforcement officials in tracking down Martin[.]"). After that, it was the physical surveillance of McLayea that led to the traffic stop, not any GPS data gleaned by means of the illegal search. Further, once McLayea was stopped, Sgt. McDonald smelled marijuana and a canine unit later alerted to McLayea's van, providing officers reason to search. In other words, the Court does not believe that the marijuana was found "by exploitation of" the illegal installation of the GPS device, but rather, "has been come at . . . by means sufficiently distinguishable to be purged of the primary taint." *Budd*, 549

F.3d at 1144 (internal quotation marks omitted). Accordingly, the Court finds that suppression of the marijuana found pursuant to the traffic stop and subsequent search of McLayea's van, as well as the evidence obtained after he was arrested, not to be warranted.[4]

## A. The Search of McLayea's Residence

Turning now to the search of McLayea's residence, McLayea argues that the gun seized from his residence must be suppressed because the traffic stop and post-arrest interview, where he gave officers his home address, are "fruit of the illegal GPS device." Def. Brief at 15. As noted above, the Court disagrees and need not repeat the above analysis here. Nevertheless, McLayea presents two other reasons why the search of his residence was improper. First, he contends that the entry into his residence was coercive and non-consensual; and second, he questions the positive field test result of the "marijuana cigarette," as later testing produced a negative result. The Court will address each argument, in turn, but ultimately does not find either to warrant suppression of the gun.

---

[4] McLayea also notes that the officers in this case did not comply with Federal Rule of Criminal Procedure 41(e)(2)(C) which sets forth the requirements for the issuance of a warrant for a GPS device. The Court notes that the officers involved in the GPS monitoring were *state* law enforcement officers, and therefore were not required to follow Rule 41. McLayea cites no Seventh Circuit case law supporting his claim that Rule 41 is applicable to state law enforcement officers, and other circuits have rejected this argument when there is such minimal federal involvement. *See, e.g.*, *United States v. Barrett*, 496 F.3d 1079, 1090-91 (10th Cir. 2007) (finding that a warrant retains its "state character" if there is only minimal, federal involvement); *see also United States v. Fort*, 478 F.3d 1099, 1106 (9th Cir. 2007) (holding that Rule 41 is only applicable to state officials if federal prosecution was assumed to result from the beginning). While Special Agent Schmidt, a federal officer, did participate in the monitoring of McLayea's jail cell phone calls, the Court does not believe this is enough to classify this matter as "a joint State-Federal investigation." Def. Reply at 8. No federal officers were involved in any part of the GPS monitoring and subsequent stop of McLayea's van. *See United States v. Jones*, 471 F.3d 868, 871 (8th Cir. 2006) ("Rule 41 applies only where a warrant is sought by a federal law enforcement officer or where the search can otherwise be characterized as federal in character. Searches may be characterized as federal in character if there is significant federal involvement in the search.") (quoting *United States v. McCain*, 677 F.2d 657, 662 (8th Cir. 1982)). Accordingly, this argument is unavailing.

"The fourth amendment generally prohibits the warrantless entry into a person's home." *United States v. Fields*, 371 F.3d 910, 914 (7th Cir. 2004) (citing *Illinois v. Rodriguez,* 497 U.S. 177, 181, (1990)). However, this "prohibition on warrantless entry into a person's home does not apply . . . when voluntary consent to enter is obtained either from the person whose property is searched or from someone, such as a spouse, with actual or apparent authority over the premises[.]" *Id*. (internal citations omitted). It is undisputed that Nevers "answered the door" and "admitted [the officers] into the entry way of [the] residence." Nevers Aff. ¶ 5.[5] Nevertheless, McLayea argues that her "consent" was not voluntary. Whether Nevers "voluntarily consented to [the entry] is a factual assessment which turns on the totality of the circumstances." *United States v. Johnson*, 495 F.3d 536, 541 (7th Cir. 2007). McLayea analogizes Nevers' encounter with the police with that in *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997)—he argues that the procedures used by the officers transformed the consensual encounter into an investigatory stop. The Court does not agree.

Nevers' encounter is distinguishable from that in *Jerez* for a number of reasons. In *Jerez*, uniformed officers arrived at a quiet hotel room late at night to try to talk to a suspect. *Jerez*, 108 F.3d at 687. Upon arriving, they began knocking repeatedly on the door, and demanded that the door to be open. *Id*. When they still did not get a response, they then began knocking on a window and shining a light through the window, illuminating Jerez while he was in bed. *Id*. In all, the officers knocked for three minutes before gaining entry into the hotel room. *Id*. at 691. The Seventh Circuit concluded that this was a seizure:

> We hold that the totality of the circumstances surrounding this encounter—the late hour of the episode, the three minutes of knocking on the door, the commands and requests to open the door, the one-and-a-half to two minutes of knocking on

---

[5] McLayea does not argue that Nevers did not have actual or apparent authority over his residence and therefore, could not have given valid consent to enter.

9

> the outside window, and the shining of the flashlight through the small opening in the window's drapes onto the face of Mr. Jerez as he lay in bed—makes clear that a seizure took place. The record simply will not support the conclusion that a reasonable person in the position of Mr. Jerez and Mr. Solis would have felt free to ignore the deputies and to continue about their business. A reasonable person in their situation could conclude only that the deputies would not leave unless the door was opened.

*Id*. at 692-93.

In contrast, when officers arrived to McLayea's residence, lights were on, indicating that someone was likely awake. While Nevers describes the knocking as "repeated and forceful," there is no indication that officers knocked for three minutes before she answered the door. At least one of the officers was in plain clothes, they did not demand the door to be opened, and they did not knock on any windows or shine any lights into the residence. Once Nevers allowed the officers to enter the home, they explained to her that she was not in trouble. Further, from Nevers own affidavit, it does not appear to the Court that she did not want to answer the door—rather, knowing of McLayea's arrest, she wanted to know if the officers had a search warrant. *See* Nevers Aff. ¶ 5. In examining the totality of the circumstances, the Court finds that Nevers consented to the entry of the officers into the residence.

Once inside, the Court does not agree that the officers conducted an "unauthorized entry into the kitchen," but rather observed the marijuana cigarette in plain view once they entered the residence. When tested, it gave a positive indication, and McLayea has submitted no evidence supporting his allegation that the "positive result" was contrived. Once this occurred, probable cause existed for the search warrant. *See Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994) ("[P]robable cause depends on information known to the police at the time, not on how things turn out."). Accordingly, the Court finds the entry and search of McLayea's residence to be proper.

10

### B. The Search of the 56th Street Facility

Finally, McLayea argues that the search of the 56th Street Facility was illegal. He again raises his concerns with the GPS monitoring, which need not be readdressed here. Notwithstanding that argument, he also alleges that there was "no nexus connecting McLayea's criminal behavior with Unit G3 and Ms. Phipps." Def. Brief at 17. The Court does not agree.

"[T]he task of determining the existence of probable cause 'is simply to make a practical, common-sense decision whether, given all of the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"). *United States v. Huebner*, 356 F.3d 807, 813 (7th Cir. 2004) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). At the time of the search of Unit G3, officers suspected McLayea of distributing marijuana and were aware that he used several storage units in Indianapolis. Upon conducting a traffic stop, officers found marijuana, a business card, and a receipt for the 56th Street facility in his van, and a receipt for Unit G3 specifically on McLayea's person. Once his home was searched, business cards for the 56th Street facility were also found, as well as other receipts for units rented to Almedia Phipps. The Court believes that a reasonable officer would suspect that there was a "fair probability" that contraband or other evidence would be found at the 56th Street facility. While Unit G3, the specific unit that was searched, was rented to Almedia Phipps, and not to McLayea, officers knew from the previously-monitored jail cell phone conversations that McLayea had been using that name to rent storage units. The Court finds that probable cause existed for the search of the 56th Street facility, and accordingly, the evidence found within need not be suppressed.

### III. McLayea's Motion for a *Franks* Hearing

Finally, the Court wishes to address McLayea's motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). *See* dkt. no. 41. McLayea argues that the two search warrants at issue in this case—the first to search his residence and the second to search Unit G3 at the 56th Street Facility—"contain[ed] perjury by the affiant, or reckless disregard for the truth by him, and the rest of the affidavit does not contain facts sufficient to constitute probable cause." *Id*. at 1. To this end, he addresses three concerns: 1) officers were not led into the kitchen by Nevers; 2) the "marijuana cigarette" produced a later negative result; and 3) the affidavits fail to mention the two-week GPS monitoring of McLayea's van.

The Court believes it has addressed these concerns above. While officers were not "led into the kitchen," they properly saw what they believed to be a "blunt" in plain view. Further, the test conducted at the scene produced a positive result, and McLayea has produced no evidence to suggest otherwise. Finally, while the affidavits do not mention the GPS monitoring, as the Court has addressed, the GPS monitoring had little to do with the search warrant applications. The GPS device simply gave Detective Wolfe McLayea's location on January 25, 2011. Accordingly, McLayea's motion for a *Franks* hearing (dkt. no. 41) is **DENIED**.

### IV. CONCLUSION

For the foregoing reasons, McLayea's motion to suppress (dkt. no. 35) and motion for a *Franks* hearing (dkt. no. 41) are **DENIED.**

SO ORDERED: 03/07/2014

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication